No. 30,642.

Lucy Kearns, Widow of John H. Kearns, Deceased, Claimant, *Appellee*, v. James W. Reed, Respondent, and The Union Indemnity Company, Insurance Carrier, *Appellants*.

(12 P. 2d 820.)

Opinion filed July 9, 1932.

*Carl E. Sanden, Roland Max Anderson, Bernard S. Gradwohl,* all of Lincoln, Neb., and *W. W. Gibson,* of Omaha, Neb., for the appellants.

*J. T. Reed* and *Miles Elson,* both of Smith Center, for the appellee.

The opinion of the court was delivered by

Hutchison, J.: This appeal is by the respondent and insurance carrier in a compensation case, where a stipulation was filed with

the compensation commissioner covering most of the facts and containing the following sentence:

ˋ "It is agreed that the only questions in issue are whether deceased, John H. Kearns, sustained injuries by accident arising out of and in the course of his employment."

The stipulation also covered the amount the widow should recover if entitled to recover anything.

The deceased at the time of his death was in the employ of the respondent James W. Reed, who had a contract with the Rock Island Railroad Company for the coaling of its engines at Phillipsburg, Kan. His duties were to keep the coal chute full of coal, clean up the coal around the chute and to coal all engines that were brought to the chute for that purpose. His wages were based upon the tonnage of coal handled. For several years prior to his death his hours of labor had been from seven o'clock in the evening to eight o'clock in the morning. He was privileged to absent himself from the chute when there were no engines to coal and there was no other work to be done. He could ascertain the time of the arrival of engines which he would be required to coal by inquiring either at the roundhouse or at the depot. The roundhouse and the coal chute were north of the main track and most of the passing tracks, and the depot was south of all the tracks. From the coal chute one could go to the depot either along the passing tracks to the roundhouse and then south across the tracks or diagonally from the chute across the several tracks to the south side of the main track and then west to the depot. This diagonal route to the depot was substantially the same as the one the deceased used in going to and from his home, which was some distance south of the right of way.

His body was found by the roundhouse foreman at 9:25 at night, three or four minutes after the arrival of the west-bound passenger train, No. 5, about midway from the engine to the rear of the train, lying immediately north of the north rail of the main track with the top of his skull severed and part of the brain substance and a considerable quantity of blood lying inside the north rail, but there was no blood flowing from the wound at that time. There was no blood on the engine or other evidence of his having been struck by this train. The east-bound train, No. 8, left Phillipsburg that night on the main track about twenty-five minutes earlier. The body of the deceased when found was lying at an angle with the track, his head against the north rail and his feet to the west about thirty

inches from the north rail, both hands and arms lying at the side of the body. There were no marks or bruises on the body other than the skull, and the clothing was not torn. His pipe was found near the body and a little to the west of it.

When he reported to his foreman that evening before seven o'clock the foreman inquired as to his health and he replied he was well but still a little weak. The foreman told him there would be no engines to coal that night until 10:30, and when he cleaned up the coal at the chute he might as well go home until 10:30. There was some evidence about his not having had his supper and being expected to return to his home for it later in the evening. Two of his brothers and a friend visited with him at the chute from about 8 to 8:40 that evening, when an engine arrived for coaling, and he bade them good night and said he would see them in the morning.

The theory of the claimant is that the deceased was going from the chute to the depot to get the line-up for the night, since the report given him by the foreman had proved to be incorrect, and that the east-bound train had started when he, in crossing over the passing track just north of the train, stumbled and fell with his head on the north rail of the main track on which the train was moving. · On the other hand, the respondent and insurance carrier contended that the death of the workman was not the result of an accident and did not arise out of and in the course of his employment, but since there was no eyewitness to the occurrence it might have been a suicide or the result of fainting, or occurred while going to or returning from his home for his own pleasure, comfort or convenience instead of going to the depot.

The commissioner of compensation found, among other things, the following:

"The commissioner is of the opinion and finds from the evidence that the death of the deceased workman was not due to suicide.

"The commissioner is also of the opinion and finds from the evidence that the death of the deceased workman was not due to fainting; and not being subject to fainting, assuming that he fainted from weakness, then his physical labor just preceding would and did aggravate his weakness, and his death was the result of personal injury by accident arising out of and in the course of his employment."

On appeal the district court of Phillips county fully ratified and approved the findings and award of the commissioner and made other and additional findings of which the following is the first:

"It is found from the evidence that the deceased, John H. Kearns, met with

personal injury by accident arising out of and in the course of his employment with the respondent on September 7, 1930, resulting in his death."

Under the limited jurisdiction of this court in compensation cases by the enactment of 1929 (R. S. 1931 Supp. 44-556), it remains for this court to determine on review if there was sufficient evidence to support the finding of the district court that the deceased sustained injuries by accident arising out of and in the course of his employment resulting in his death. This is, strictly speaking, a law point and included within it are the two other law questions of whether the injury was an accident, and whether it arose out of and in the course of his employment.

Appellants have cited many pertinent authorities from this and other jurisdictions holding it to be necessary for the claimant to establish these features by sufficient evidence before being entitled to an award of compensation, and then, in the absence of eyewitnesses, suggest other plausible theories, all of which could be said to be sustained to some extent by the circumstantial evidence. If the rules of evidence in cases of this character required such a degree of certainty as to exclude every other reasonable conclusion, it would be almost impossible to make a finding based largely upon circumstantial evidence. But it was held otherwise in the recent case of *Supica v. Armour & Co.*, 131 Kan. 756, 293 Pac. 483, where it was said:

"In a compensation case it is not required that the claimant shall establish his right to an award by direct evidence alone. Circumstantial evidence may be used to establish the claim, and it is not necessary that the circumstantial evidence should rise to that degree of certainty as to exclude every reasonable conclusion other than that found by the trial court." (Syl. ¶ 2.)

That was the case where the night watchman fell through a shed roof, and it was urged that it was not his usual course for inspection and therefore the injury did not arise out of and in the course of his employment.

Considering the evidence altogether, we have no serious difficulty in finding under the rule above stated that it supports the view that the injury occurred by stumbling and falling while deceased was on his way to the depot as against the other possible and plausible conclusions that it might have been suicide, or happened by his fainting, or occurred while on his way to or from his home. He was not accustomed to having fainting spells. His wife and brother never knew him to faint. He was in good frame of mind that evening when he told the foreman he was well only a little weak. He

told his two brothers and friend at 8:40 that evening he would see them in the morning. The physician said there was nothing to indicate he had been dead for some time before his head had been cut off and that the copious flow of blood found inside the rail indicated that he had been killed by violence. The inadvertent and irresponsible statements about his going home that night for supper are fully explained by the witness who made such statements, and as to the brother seeing him come from his home after 9 o'clock, that is shown by the brother's testimony to have been on a different night. The evidence of the physician that the death appeared to have been instantaneous and the result of his head being crushed, not only eliminates the suicide and fainting theory, but substantially makes the occurrence an accident. The love of life, aside from the cases of suicide or fainting, impels one to use self-protection and caution, so that the instant crushing of the skull and death were occasioned by accidental stumbling and falling appears to be the only reasonable inference and conclusion from all the circumstances.

All the elements of an accident appear to be contained in this occurrence as the term is defined in *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793, *Barker v. Shell Petroleum Corp.*, 132 Kan. 776, 297 Pac. 418, and other decisions, viz., (1) undesigned, (2) sudden, (3) unexpected, (4) usually of an afflictive or unfortunate character, (5) often accompanied by a manifestation of force, and (6) time, place and circumstance.

Appellants most forcibly urge that this unfortunate occurrence did not arise out of and in the course of his employment, citing many cases in support of their contention, insisting that the deceased had no duties under his employment that called him away from the chute, and particularly if he was on his way to the depot to get the line-up for the night, that information was not necessary to the proper and efficient discharge of his duties, but was for his own convenience and pleasure because of the liberal rule, recognized in the service and by his foreman, that he did not need to remain at the chute when it was known in advance that no engines would be there to be coaled for some time. The reasoning is sound if such information affected only the liberty and freedom of the workman and did not in any way facilitate or assist in the performance of the work and had not become a recognized custom. The foreman of the deceased testified emphatically that the getting of the line-up from the depot or roundhouse had nothing to do with their work at

the chute; that they only got it so they could leave the chute for an hour or more for personal convenience, and yet it appears from his evidence that he got the line-up quite regularly and often from the roundhouse and sometimes from the depot. The evidence shows that the deceased got the line-up quite regularly and often from the depot. This information was thought by some of the witnesses to facilitate and help with the work at the chute. It does not seem reasonable that intelligent workmen these days, with all the modern conveniences for keeping informed as to prospective work and duties, would be content to sit in or at the chute unconcerned until the next engine might arrive for coaling, when they might know in advance by stepping across to the depot or roundhouse just what was coming and when it could be expected. But aside from the question of the information being such as to facilitate the work, the evidence is uniform that it was the usual custom to get the line-up either from the depot or the roundhouse, and as the deceased usually and regularly went to the depot for it with the knowledge of the foreman as to that custom and habit, that fact would make the injury fall within the rule of being one arising out of and in the course of the employment.

"In an action under the workmen's compensation law there was evidence that the plaintiff, a seventeen-year-old girl, who was paid by the hour, was injured during the half-hour intermission at noon while, although at liberty to leave the premises, she remained there, and after eating her lunch engaged with fellow employees in accordance with a custom known to and approved by her employer, in riding on a truck, her injury being caused by falling from the truck while it was being drawn by a fellow employee; *held,* that a finding was justified that the accident occurred in the course of her employment." (*Thomas v. Manufacturing Co.,* 104 Kan. 432, syl. ¶ 1, 179 Pac. 372.)

In the same volume is the case of *White v. Stock Yards Co.,* 104 Kan. 90, 177 Pac. 522, where with the knowledge of the foreman the workmen played practical jokes on each other, and the fact that it was a known custom placed it as something arising out of and incident to the employment.

"Where an employee whose working day began at 7 a.m. arrived at his place of employment a few minutes prior thereto, registered his attendance, and went to a dressing room provided by his employer and there sustained a fall and injury while putting on his overalls, from which injury and other infirmities he died, it is held that the accidental fall and injury were incidents of the employment . . ." (*Corpora v. Kansas City Public Service Co.,* 129 Kan. 690, syl. ¶ 3, 284 Pac. 818.)

In the case of *Taylor v. Hogan Milling Co.,* 129 Kan. 370, 282

Pac. 729, where an employee in a milling company during the hours of service went to the upper floor on the man-lift to pay a bill he owed to a fellow employee, with the permission of the foreman and approval of the company to pay bills when presented, his injury on the man-lift was held to be incident to his employment and to have arisen out of it.

In the case of *McDonnell v. Swift & Co.*, 124 Kan. 327, 259 Pac. 695, a workman for the packing plant owned his own car and used it for his own pleasure and convenience, including coming to his work, and had an accustomed place of parking it, as other workmen had, with permission of the employer. He reported to the foreman that another car was parked in his usual space and the foreman told him to hunt the party and tell him about it. He learned his name and where he worked, and in going to see him fell into a vat of hot water, and it was held the injury arose out of and in the course of his employment. In effect when a workman is directed by a foreman or superior officer to perform a duty, or he does something that is usual and customary to be done and which the employer has full knowledge of its being a custom and expressly or impliedly consents thereto, and an injury results therefrom, the injury is said to arise out of and in the course of the employment.

Some of the cases cited hinge upon the four words "on, in or about," which formerly were in our compensation statute but not since the amendment of R. S. 44-505 in 1927, so that the fact of the injury occurring a short distance from the chute is not of the same force as it formerly was. The insurance policy in this case recognizes by the following liberal terms that the liability thereon is not always limited to occurrences on the restricted area where the work is performed:

"This agreement shall apply to such injuries so sustained by reason of the business operations described in said declarations which, for the purpose of this insurance, shall include all operations necessary, incident or appurtenant thereto, or connected therewith, whether such operations are conducted at the work places defined and described in said declarations or elsewhere in connection with, or in relation to such work places."

We conclude that there was evidence sufficient to support the findings of the trial court, including the particular and necessary finding that the injury sustained by the deceased resulting in his death was an injury by accident arising out of and in the course of his employment.

The judgment is affirmed.