No. 36,640

HOWARD DUNCAN, *Appellant*, v. PERRY PACKING COMPANY, ARTHUR F. PEINE, BRYAN BURGETT, and WILLIAM BLOOMBERG, *Appellees.*

(174 P. 2d 78)

Opinion filed November 9, 1946.

*Robert Stone,* of Topeka, and *Charles Gordon Watts,* of Wagoner, Okla.,

argued the cause, and *Irving M. Platt,* of Junction City, *James A. McClure, Robert L. Webb, Beryl R. Johnson* and *Ralph W. Omen,* all of Topeka, were with them on the briefs for the appellant.

*Robert E. Russell,* of Topeka, argued the cause, and *Hal E. Harlan, Ambrose Johnston,* both of Manhattan, *Clayton E. Kline, M. F. Cosgrove* and *Balfour S. Jeffrey,* all of Topeka, were with him on the briefs for the appellees.

The opinion of the court was delivered by

Hoch, J.: This was a common-law action against an employer to recover damages for the wrongful death of an employee, the wife of the plaintiff. The case is here on appeal by the plaintiff from an order sustaining the defendants' demurrer to the petition. The demurrer was sustained on the ground that the injury resulting in death was within the workmen's compensation act and that therefore a common-law action for damages would not lie. The controlling question is whether the injury was a "personal injury by accident arising out of and in the course of employment" within the meaning of the workmen's compensation act (G. S. 1935, 44-501).

The case being here on demurrer, all facts well pleaded in the petition must be taken as true. The pertinent facts, disclosed by the allegations, may be summarized as follows: The defendant company, the Perry Packing Company, is a Kansas corporation which has for many years been engaged in the poultry and cold-storage business in Manhattan, Kan.; the three individual defendants named were the general manager, the superintendent of the poultry department, who was in general charge of the picking room where the injury occurred, and the foreman of the picking room who was subject only to the order and direction of the superintendent and general manager; the company was operating under the Kansas workmen's compensation act and the employee whose wrongful death is alleged had not elected not to come within the workmen's compensation act; at all times in question there was in force in Manhattan an ordinance entitled Electrical Ordinance, which ordinance was referred to and made a part of the petition; said ordinance provided that all electric light, heat or power wires or apparatus should be installed in accordance with the requirements of the national electric code, provided that in certain cases deviation from such rules and requirements might be authorized by the electrical inspector; under the ordinance permits for electrical construction work may be issued only to master electricians who have complied with the provisions of the ordinance, and every person entering upon

any electrical construction or erection of any light, heat or power wires in any new building in Manhattan—with certain exceptions not here material—is required to make application on forms furnished by the city to the electrical inspector for a construction permit before proceeding with such construction; the ordinance further provides that "all service wires shall be in conduit, and all main switches shall be enclosed in an approved steel cabinet of a safety enclosed type, and operated from the outside of the enclosure, and so marked as to indicate plainly, without opening the enclosure, whether the switch is in the 'on' or 'off' position. All service wires to be not less than No. 10 B. & S. gauge"; the ordinance further provides that "approved metallic conduit, armored cable or metal moulding shall be required . . . in any installation requiring more than three feet of conductor in old buildings or additions thereto . . . and all such conduit, armored cable or metal moulding shall be installed according to the rules of the national electric code"; the defendants failed to comply with section 10 and with the provisions of the national electric code because they did not install the machine referred to, or the wires or apparatus connected with the machine, in accordance with the rules and requirements of section 10 or of said national electric code; the electrical inspector did not authorize any deviation from the rules and requirements, nor did the defendants apply for or obtain any permit for installation of the machine here involved and did not install it in accordance with above recited provisions of the ordinance, and "did not maintain said electrical apparatus in accordance with said ordinance in that the service wires were not placed in conduits, or metallic conduits, armored cables, or metal moulding, or comply with any other similar provisions of said ordinance, but maintained the said machine in an unsafe and dangerous condition"; for more than four years prior to July 17, 1944, the date of the fatal injury involved, the defendant company had maintained an electrically operated machine in the picking room of its plant, which machine—being called a buffer—had a large cylindrical shaped part about two feet in diameter and six feet in circumference and about three or four feet long and equipped with rubber teeth; near one end of the machine was a steel platform large enough for one person to stand upon while applying scalded chickens recently killed to the buffer in a manner which would cause the feathers to be removed rapidly; in performing this operation, the employee standing upon the platform would take hold of the scalded

chickens which were being transported above the buffer by a chain upon which said chickens were hung immediately after being scalded; the machine was located on a cement floor and the buffer was turned rapidly by an electric motor carrying 440 volts of electricity.

At the time when the injury to the employee occurred, and for about four years prior thereto, this electrically propelled machine was not grounded and all of the electric current was transmitted to the machine in what is known as "B'X wiring."

On many occasions over a period of four years prior to July 17, 1944, and "by reason of the conditions obtaining and the faulty installation and handling of said electric current, sundry employees had received severe shocks through said machine and on many occasions flashes of fire resembling lightning had been observed by employees within said picking room and especially in and about said machine and buffer."

Isabel Duncan, wife of the plaintiff and mother of his six minor children, had been employed by the defendant company during the months of May, June and until the 17th day of July, 1944, and at no time during that period had any such incidents occurred and she "had no knowledge whatever regarding the uncontrolled electric current and the shocking of persons and activities of said electric current in said picking room" and the plaintiff in the action had no knowledge thereof; other employees knew about these electric shocks suffered by persons and about flashes of electricity in the room and during all of the four years prior to July 17, 1944, the foreman and the superintendent had full knowledge thereof and at all times knew that the machine was not grounded and during all of the same period the general manager had intimate knowledge concerning the installation, shorting, the ungrounded condition and the flashes of fire as they appeared in the picking room; "all of said officers knew that said machine was dangerous to the life and limb of persons employed in said picking room" but notwithstanding this knowledge of these dangers they "willfully neglected and refused to mend said machine or correct or eliminate said dangers."

On July 17, 1944, "Isabel Duncan, while in the performance of her assigned duties on said machine was suddenly electrocuted and killed in said picking room"; she was then thirty-eight years of age and in fine health; the defendants knew at all times that the uncontrolled 440 volts of electricity was inherently dangerous to the life and safety of every employee and especially to Isabel Dun-

can who had been assigned to stand upon the platform heretofore mentioned, but notwithstanding that fact they selfishly and willfully neglected and refused to eliminate the danger or do anything about it; defendants knew that Isabel Duncan had spent most of her life upon a farm, had had no experience with electric current, knew nothing about the dangers and hazards of electric current installed in the faulty manner heretofore stated, but "notwithstanding their full knowledge in that respect, they willfully neglected to tell her anything about that which she should know regarding the faulty installation, the ungrounded condition and the dangers obtaining in said picking room . . . and selfishly and willfully neglected and refused to advise or tell her anything about it"; the defendants knew that the electric current was ungrounded in the room which had a cement floor "and with the lavish use of water necessary in the scalding operation and handling of said chickens with 440 volts of electricity used in the propelling of said machine as faultily installed as herein alleged was a constant threat to any life which was working in and about said picking room and especially where Isabel Duncan was forced to stand while so employed," but that notwithstanding such knowledge they selfishly and willfully neglected and refused to eliminate the danger or do anything about it; defendants knew that a heavy rubber mat should be placed upon the steel platform in question in order to protect the body of the employee against the electric current that might find its way into the platform but they selfishly and willfully neglected and refused to install such mat upon the platform; defendants knew that in the picking room a great amount of water was used in scalding the chickens, that the floor was constantly wet and that water was constantly dropping from the chain transporting the chickens above the buffer to the floor and on the machine, and they knew that "the electric installation in and all about said picking room was made of what is known as 'B'X' installation, or insulation, and that said 'B'X' insulation absorbs water, and that under no circumstances should such 'B'X' insulation be used to conduct said electricity into said room and its use about said machine; that notwithstanding said knowledge, said defendants selfishly and willfully neglected and refused to install lead insulation which is a nonabsorbent of water and which is the only proper insulation to be used in said picking room." The injury to and death of said Isabel Duncan was "an event which should have been foreseen and

anticipated" by the defendants, "and could have been easily guarded against and would not have occurred had the defendants complied with the provisions of said ordinance, or had installed said machine in a proper manner and had kept it properly grounded, and had used service wires that were properly insulated, and had taken usual and ordinary means for the proper protection of the said Isabel Duncan while operating the said machine.".

Allegations substantially the same as those that have been recited, are repeated a number of times in the petition.

The general principles or purposes upon which workmen's compensation acts rest are so well recognized as to require no elaboration here. It is important, however, to bear them in mind in any approach to a question such as the one here presented. These acts are largely the outgrowth of modern industrial life. They give recognition to a broad social obligation, in furtherance of sound public policy. The public has come to realize that in many cases an injured employee engaged in a hazardous employment will be unable to establish actionable negligence on the part of the employer, but that it is unjust to deny relief to the employee on that account. For this and similar reasons, workmen's compensation acts have shifted from the employee to the industry and indirectly to the general public certain burdens incidental to modern industrial operations (71 C. J. 242-249). Compensation is thus provided for injuries by accident arising out of and in the course of the employment, regardless of any showing of negligence on the part of the employer. On the other hand, the amount of compensation so provided is in many cases substantially less than might be secured by the injured employee in a common-law action, where the employer's negligence is established. There is thus a sort of balancing of benefits in the common interest. Some employees may receive less compensation for injuries received than they would have been able to receive in a common-law action, while many other employees will receive benefits which they otherwise would not be able to receive because of inability to establish the employer's negligence. In harmony with this general principle, the negligence of the employer is not a matter at issue in a workmen's compensation case. Furthermore, it is provided in our statute and in such statutes generally that it shall not be a defense to the employer that the employee assumed the risk of the hazard resulting in the injury, that the injury or death was caused by the want of due care by a fellow servant or

that the employee was guilty of contributory negligence (G. S. 1935, 44-544).

Our workmen's compensation act (G. S. 1935, 44-501 to 44-565, ch. 44, art. 5, as amended) thus establishes a broad system covering all injuries by accident within its purview. And the act specifically provides that "save as herein provided no such employer shall be liable for any injury for which compensation is recoverable under this act" (G. S. 1935, 44-501). Consonant with this specific provision and in harmony with the whole purpose and tenor of the act, we have repeatedly held that "the workmen's compensation act establishes its own procedure and furnishes a remedy which is substantial, complete and exclusive, from the inception of the claim to final judgment thereon" (*Taylor v. Taylor*, 156 Kan. 763, syl. ¶ 1, 137 P. 2d 147; see, also, cases cited in late case of *Hoffman v. Cudahy Packing Co.*, 161 Kan. 345, 166 P. 2d 613).

Was the injury resulting in the death of Isabel Duncan compensable under the act? It is conceded that the employer was under the act and that the employee had not elected not to come under the act. Clearly the injury occurred "in the course of" the employment. It occurred directly in connection with the work to which she had been assigned in operating the machine, and we cannot say it was not also one "arising out of" the employment.

Appellant urges, however, that while the injury may have been an injury "by accident" as far as the employee was concerned, it was not in reality an "accident" as far as the employer was concerned, being readily foreseecable by him, in the light of the preventable peril to the employee which he knew existed, but of whose existence the employee had no knowledge or warning. We find no support in the act or in the authorities to support this restricted definition of "accident." The word "accident" has been frequently defined in our cases (*Echord v. Rush*, 124 Kan. 521, 261 Pac. 820; *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793; *Barker v. Shell Petroleum Co.*, 132 Kan. 776, 297 Pac. 418; *Kearnes v. Reed*, 136 Kan. 36, 12 P. 2d 820; *McMillan v. Kansas Power & Light Co.*, 157 Kan. 385, 139 P. 2d 854). It has been said that the necessary elements of an accident are: (1) undesigned; (2) sudden; (3) unexpected; (4) usually of an afflictive or unfortunate character; (5) often accompanied by a manifestation of force; and (6) referrable to a definite time, place and circumstance. The injury here clearly falls within the definition. It is stated in 71 C. J. 571 that in de-

termining the statutory meaning of the word "accident" as used in workmen's compensation laws "it is the expectation, intention, or design of the workman that is to be regarded." In *Gilliland v. Cement Co.*, supra, it was said:

"The word 'undesigned' must not be taken too literally in this connection, because *a person may suffer injury accidental to him, under circumstances which include the design of another.* The same warning may be extended regarding other elements of the definition." (Italics supplied.) (p. 773.)

Furthermore, it should be noted that the plaintiff did not allege that the employer intended to injure the employee or that he knew that an injury to an employee was certain to result, or that any of the defendants harbored any ill will toward her.

Whether the facts alleged in the petition show negligence only or whether they show wantonness on the part of the employer may be debatable. But even if the acts or conduct alleged do show wantonness, we find no authority either in the statute or in our decisions construing the statute that would justify us in saying that the injury was not compensable under the workmen's compensation act. Considering the whole subject broadly, the legislature has made certain exceptions such as agricultural pursuits (G. S. 1935, 44-505), interstate commerce (G. S. 1935, 44-506) and others, but has not included "willful misconduct" or "wantonness" of the employer among the exceptions. Nor is there any distinction between "gross negligence" and any other degree of negligence, as far as applicability of the act is concerned (see 71 C. J. 1485). If so compensable, an action at common law will not lie. To hold otherwise would open a by-pass around the act and permit attempted recovery in common-law actions which the act was intended to supersede. If the plaintiff here had established the same facts in a proceeding to secure compensation under the act, can there be any doubt that he would have been entitled to an award? If so entitled, it follows, under our decisions, that such relief is exclusive.

The workmen's compensation acts of some of the states—such as those of California, Massachusetts and Ohio—provide for increased compensation in the case of "willful misconduct" on the part of the employer. Decisions under such statutes are not in point here since our statute contains no such provision. But the fact that such a provision is omitted from our statute is in itself an indication that the legislature did not intend when it enacted the workmen's compensation act, broad in its scope and provisions, to permit the

injection of the question of wantonness or of willful misconduct of the employer into cases otherwise under the act.

Appellant stresses the case of *Boek v. Wong Hing,* 180 Minn. 470, 231 N. W. 233, 72 A. L. R. 108, in which the plaintiff was permitted to maintain a common-law action for damages notwithstanding the fact that defendant was operating under the act. In that case the defendant had intentionally struck the plaintiff, inflicting serious injury. In that case it was said (pp. 2 and 3, appellant's brief):

"No case has been cited where it has been held that one who wilfully assaults and injures a workman while in the course of his employment, be he an employee, employer, or a stranger, when sued for the tort can successfully interpose as a defense that the plaintiff and his employer are under the Workmen's Compensation Act and his sole remedy is thereunder. . . . *An employer who intentionally and maliciously inflicts bodily injuries on his servant should occupy no better position than would a third party not under a Compensation Act and should not be heard to say, when sued at law for damages, either that the injury was accidental or that it arose out of the employment."* (p. 471.)

We find no analogy between that case and the one before us. It is clear that injury inflicted upon an employee by an employer's assault is not an injury arising by accident out of and in the course of the employment. No such situation exists in this case. It is not alleged that the employer intentionally injured the employee. There are many cases similar to the Minnesota case involving assault or other acts by the employer clearly unconnected with the employment, but no purpose would be served by reviewing them since the distinction between these cases and the instant one is obvious.

Considerable analogy to the case here is to be found in cases involving failure of the employer to comply with laws or regulations as to installation of safety appliances or proper safeguards, especially in the case of dangerous machinery. The general rule is that in the absence of specific statutory provision therefor, such failure does not affect the rule as to exclusive remedy (71 C. J. 1484, 1485). Our statute contains no such provision.

It follows from what has been said that the demurrer was properly sustained.

The judgment is affirmed.

WEDELL, J. (concurring): I deem it unnecessary to add much to the well-written majority view by Mr. Justice Hoch. There are, however, a few thoughts that seem worthy of emphasis.

Careful consideration of the question presented, to my mind, compels an affirmance of the judgment. I agree the question presented is whether the injury was the result of an "accident" within the meaning of that term as contemplated by our compensation law. I have no doubt it was. The fact the employer may have knowledge of the dangerous machinery or equipment and fails to guard against it does not mean an injury resulting therefrom is not an "accident." All that is necessary to make the injury accidental under the act is that it be undesigned, sudden and unexpected insofar as the workman is concerned. A few of the decisions so holding are *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793; *Barker v. Shell Petroleum Corp.*, 132 Kan. 776, 297 Pac. 418. In the Gilliland case it was said:

"In this instance all the characteristics of an accident were present. The occurrence was sudden, unexpected, and undesigned *by the workman.*" (p. 773.) (Emphasis supplied.)

In the Barker case, *supra*, we said:

"In the case at bar the incident was an untoward event, not expected or designed *by the workman.*" (p. 783.) (Emphasis supplied.)

The injury in the instant case being accidental in character it was covered by the act and was compensable only according to its terms.

Another reason for concluding our compensation act covers this accidental injury is that under the liberal construction we have given the act for the benefit of the workman it is not necessary the injury should result directly from a peculiar hazard of the employment. In order to hold the employer liable it is sufficient if the injury is incidental to the employment. A few of our decisions to that effect are *White v. Stock Yards Co.*, 104 Kan. 90, 177 Pac. 522; *Tierney v. Telephone Co.*, 114 Kan. 706, 709, 220 Pac. 190; *Mathis v. Ash Grove L. & P. C. Co.*, 127 Kan. 93, 97, 272 Pac. 183; *Pegg v. Postal Telegraph-Cable Co.*, 129 Kan. 413, 283 Pac. 58; *Fairchild v. Prairie Oil & Gas Co.*, 138 Kan. 651, 27 P. 2d 209; *Wetlaufer v. Howse*, 146 Kan. 500, 504, 71 P. 2d 879; *Floro v. Ticehurst*, 147 Kan. 426, 431, 76 P. 2d 773; *Murphy v. I. C. U. Const. Co.*, 158 Kan. 541, 543-548, 148 P. 2d 771. So, if the instant injury did not necessarily flow directly from the particular hazards of the employment it did at least occur as an incident of the employment. The result is the employer was liable under the compensation act and the recoverable compensation was measurable by the terms of that act and not otherwise. The employer being liable under the act he is by express statutory provision relieved of other liability.

Our compensation act says, "Save as herein provided no such employer shall be liable for *any injury* for which compensation is recoverable under this act." (G. S. 1935, 44-501.) (Emphasis supplied.) It should be observed our statute nowhere excludes or excepts from the act injuries which are not accidental insofar as the employer is concerned. Our law says "any injury." It follows the fact an employer knows, or should know, of the dangerous' condition and fails to guard against it does not relieve him of liability under the act. Our compensation act in express terms limits the remedy of the workman against his employer for an accidental injury to the compensation provided by the act. Whether this limitation is unwise presents a legislative and not a judicial problem.

It is also well to remind ourselves that the lawmakers intended by the compensation act to make certain the workman and his dependents would never be denied compensation for accidental injury. Compensation for such injury was therefore insured irrespective of whether the employer was negligent. Nor may the employer assert assumption of risk, contributory negligence of the workman, or of a fellow workman, as defenses to a claim for compensation. If a workman who is subject to the act is permitted to elect another remedy—a remedy for damages under the common law—the employer may assert all such defenses with the result that the workman and his dependents frequently may be denied the compensation the lawmakers were determined they should receive. Such a result would be wholly contrary to the policy, intent and purpose of the compensation act.

Hoch, J. (dissenting): With much that is said in the court's opinion, which fell to my lot to write, I am in agreement. But being unable to concur in the most important holding in the case, I will state broadly the reasons which impel me to dissent.

At the outset it is well to repeat that since the sole purpose of this appeal is to test the sufficiency of the petition as against demurrer, the plaintiff's allegations of fact must here be treated as true. It is not our function to speculate whether the plaintiff would be able to establish the facts alleged or the defendants would be able to refute them.

To narrow the issue, let me say at once that I agree fully with the proposition that the workmen's compensation act is complete in itself and that the relief or remedies which it provides are *exclusive*

as to all injuries *"within the purview"* of the act. The question is whether the injury which caused the death of Isabel Duncan was in fact an injury *within the purview* of the act. In other words, was the act intended to apply to injuries to employees resulting from facts and circumstances such as those here alleged.

Had the injury which caused the employee's death resulted merely from the *negligence* of the employer—even though the negligence might be considered *gross* negligence—the injury would undoubtedly fall within the purview of the compensation act and a common-law action would not lie. But we here go beyond that well-established doctrine. We here for the first time put *wanton* conduct of an employer in the same class with negligence, as far as the employee's remedy is concerned. In other words, we say that if an employee's injury, otherwise under the act, results directly from the *wantonness,* from *wanton acts* or *conduct* on the part of the employer, the employee is in no different position than an employee injured as a result of the employer's mere *negligence,* or even where there had been no negligence by the employer. I do not believe the legislature intended such injuries to be "within the purview" of the act.

The ultimate question is this: In using the language "personal injury by accident arising out of and in the course of employment," did the legislature intend to include anything more than what a person of ordinary prudence should be held reasonably to have contemplated as a hazard incident to the employment? To put it in another way, is it a reasonable interpretation of the statute to say that an injury resulting directly from *wanton conduct* on the part of the employer, can be classed as one "arising out of" the employment?

The distinction between *negligence* and *wantonness* has frequently been stated by this and other courts and it has been repeatedly pointed out that the latter differs from the former not merely in *degree* but in *quality or kind.* I shall not burden this statement with extensive quotation from the countless cases which emphasize the distinction. In the recent case of *Frazier v. Cities Service Oil Co.,* 159 Kan. 655, 157 P. 2d 822, wherein the distinction was again examined and authorities, including many of our decisions, were cited, it was said:

"To constitute wantonness, the acts complained of must show not simply lack of due care, but that the actor must be deemed to have realized the im-

minence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not . . . If the actor has reason to believe his act may injure another, and *does it being indifferent to whether it does or not, he is guilty of wanton conduct.*" (Italics supplied.)   (Syl. ¶ 5.)

Since the court holds that even if the alleged acts and conduct of the employer constituted *wantonness* and not merely *negligence,* the allegations need not be recited again in full detail. It is pertinent, however, to expression of my views, to summarize them. Plaintiff alleged that the motor which operated the buffer, and which carried a high and dangerous voltage was installed in disregard and in violation of the ordinance; that it was not grounded; that it was installed in an improper and dangerous manner; that because of this improper, unlawful and dangerous installation, flashes like lightning had frequently been given off by the machine during a period of four years preceding the accident and that a number of employees had been "severely shocked" as a result of this unlawful and dangerous installation; that the wires were not placed in proper conduits; that the steel platform was not covered with a protective rubber pad; that operation of the machine, thus unlawfully and dangerously installed, was a constant menace "to the life and limb" of employees operating it; that the defendants at all times knew of the existence of this hidden danger; that the deceased employee was inexperienced in the operation of electrical machinery; that during the comparatively short period she had been at work, nothing had happened to put her upon notice of any hidden danger and that she had no knowledge of it; that in spite of these facts the defendants refused and neglected to warn her of the existence of this hidden peril "to life and limb," or to remove such hidden danger and peril. Clearly these are allegations of complete disregard of the safety of the employee and of indifferences to any injury that might happen to her. If such allegations do not charge wantonness, within the oft-repeated definition, I do not know how allegations of wantonness could be framed. Certainly in no definition of wantonness that I have been able to find is it made an essential that the person who commits the wanton act, either of commission or omission, deliberately intends to cause injury to a particular person. It is sufficient if he knows of a serious and hidden danger of which the other person has neither knowledge nor warning and deliberately permits the other person to subject himself to it, with indifference to whether injury will result. And

particularly so if this indifference to the other's safety persists over a considerable period of time.

No case strictly in point on either side of this issue of wanton conduct is cited in any of the briefs submitted, and our quite extensive research has ·failed to find one. This is to be explained, partly at least, by the divergence of statutes in the various states. For instance, as noted in the court's opinion, some workmen's compensation acts provide double compensation where "willful misconduct" on the part of the employer is shown. It is said in the court's opinion that the fact that our statute has no such provision indicates that the legislature meant to fix the compensation for all injuries, otherwise under the act, regardless of whether they resulted from the employer's *wanton* conduct. I think that with at least equal reason it may be argued that the fact it provided no added compensation in case of *wantonness* indicates it did not consider injuries so caused to be within the act and did not intend to take from an employee so injured, his common-law remedies.

· While no cases, decided under like facts and law, have been found, the cases and the textbooks are replete with statements which support the view that only such injuries are within the purview of compensation acts such as ours, which the employee can reasonably be said to have contemplated might happen when he entered the employment. These statements embody what seems to me a sound and fundamental principle. Here are typical statements from among many which might be quoted. In 1 Schneider's Workmen's Compensation Law, 2d ed., 736, it is said:

"The accident must result from a risk *reasonably incident* to the employment, or the injury *cannot be said to arise out of it.*" (Italics supplied.)

In 71 C. J. at page 651:

"In order that an injury may be said to have arisen out of the employment, it must have been the rational·consequence of, or have had its origin in, a *risk inherent in,* or connected with *or reasonably incident to,* the employment, *flowing therefrom as a natural consequence.*" (Italics supplied.)

In Eifler's Case, 276 Mass. 1, 176 N. E. 529, it was said:

"The purpose of the act is to compensate employees for injuries arising out of and in the course of their employment. *But an injury does not arise out of an employment when the risk is one not fairly contemplated by the agreement of employment.*" (Italics supplied.) (p. 2.)

Another way of putting the question is to ask whether if the employer through wanton conduct subjects the employee to an "added

risk"—something not reasonably within the contract of employment —he can hold the injured employee to the limited compensation provided in the compensation act. It has been repeatedly held that if the *employee* deliberately subjects himself to an "added risk" not reasonably incidental to his employment and thereby suffers injury, he cannot be heard to say that the injury was one "arising out of" the employment. (1 Schneider's Workmen's Compensation Law, 2d ed., 917, cases cited in note 21.) Why should the same sort of rule not apply also as against the *employer?*

One who enters a hazardous employment, covered by the act, accepts the limitation of compensation fixed by the act as to all injuries *reasonably contemplated as incident* to the employment. He must assume the possibility of *negligent* acts by the employer, but at the same time is protected by the act against a defense of contributory negligence. But I see neither reason nor justice in saying that he should also contemplate that the employer may knowingly and *wantonly* subject him to a serious and hidden danger of which he has no knowledge, of which he is given no warning, and whose existence he has no reason to suspect.

In its bearing upon the immediate question, there is little if any difference between a case of "assault" made by the employer in connection with the employee's performance of his work, and a *wanton indifference* to the safety of the employee in the presence of a great peril known to the employer but unknown to the employee. In neither case can it reasonably or fairly be said that the employee undertakes such a risk when he enters the employment. The employee has as much right to assume that the employer will not endanger his life by wanton acts or conduct as he has to assume that the employer will not physically assault him. Indeed, cases may well be envisioned where there would be more extenuation for the striking of an employee in sudden anger because of the employee's persistent violation of repeated directions as to the proper operation of some machine, than there would be for wantonly subjecting the employee to a hidden peril in operating the machine.

A concluding observation. It is suggested in the court's opinion that if the plaintiff had filed a claim for compensation under the act and had made the same allegations that are made in the instant petition, we would not have denied his right to compensation, and that therefore a common-law action will not lie. This literal-

istic argument ignores realities and is not convincing. In the first place, no employee proceeding under the Compensation Act would have any need or occasion to allege wanton conduct by the employer, being entitled to compensation without any necessity of establishing it. If, in such a proceeding under the act, he should include such unnecessary allegations, I apprehend they would be treated as surplusage and not fatal to prosecution of the claim. Furthermore, it is quite too fanciful to imagine an employer defending or being permitted to defend upon the ground that he, the employer, was responsible for the injury by his own wanton conduct.

In the separate concurring opinion of Mr. Justice Wedell, the proposition that it is sufficient to hold the employer liable, under the act, "if the injury is incidental to the employment," is emphasized. I subscribe fully to this well-established rule or principle. But it does not resolve the question here. The issue here presented is whether—assuming the facts to be as alleged—the injury and death of Isabel Duncan *were,* in fact, *"incidental* to the employment." As I see it, they were not *incidental* to the employment, because they were not such incidents as can justly be said to be contemplated as one of the risks of the employment.

The court now holds that an employee subjects himself, under the act and the remedies it provides, to the hazard of hidden perils to his life of which he has neither knowledge nor warning and to which *he would not be subjected* except for *wanton* acts or conduct of the employer, or in other words, for the employer's *wanton indifference* to and disregard of his safety. I cannot regard hazards of that sort as *"incidental* to the employment." Nor can I believe that any such result is within the purpose or intent of the act or in harmony with the liberal construction to which we are firmly committed.

SMITH, J., joins in the foregoing dissenting opinion.