Edwin Raymond **FITZGERALD** Sr., and his wife, Patricia B. Fitzgerald, Plaintiffs,

v.

**COMPANIA NAVIERA LA MOLINERA** et al., Defendants.

Mrs. Louise Cousins **PRITCHARD**, Individually and as Administratrix of the Estate of Noah Pritchard, and as Administratrix of the Estate of Nolan Gerard Pritchard, Plaintiff,

v.

**COMPANIA NAVIERA LA MOLINERA** et al., Defendants.

Civ. A. Nos. 74–598 and 74–2153.

United States District Court, E. D. Louisiana.

Dec. 26, 1974.

On Motion to Certify Appeal Jan. 15, 1975.

---

38. Ransburg Electro-Coating Corp. v. Spiller and Spiller, Inc., 489 F.2d 974, 978 (7th Cir. 1973).

See also, D.C., 394 F.Supp. 413.

404

Steven R. Plotkin, Owen J. Bradley, New Orleans, La., for plaintiff, Edwin Raymond Fitzgerald, Sr. and his wife, Patricia B. Fitzgerald.

B. J. Trombatore, Kenner, La., for plaintiff, Mrs. Louise Cousins Pritchard.

Rufus C. Harris, Jr., Robert J. Barbier, Terriberry, Yancey, Carroll & Farrell, New Orleans, La., for defendant, Marine Trading, Ltd.

H. Edward Weidlich, Jr., Drury, Lozes & Curry, New Orleans, La., for defendant, Shilstone Testing Laboratories.

John E. Galloway, H. Barton Williams, Overton T. Harrington, Jr., Deutsch, Kerrigan & Stiles, A. R. Christovich, Jr., Christovich & Kearney, New Orleans, La., for defendant, New Orleans Public Grain Elevator.

Breard Snellings, Sessions, Fishman & Rosenson, New Orleans, La., for defendants, Guillory, Squires, Miller and Colley.

David R. Normann, Normann & Normann, New Orleans, La., for defendant, Research Products Company.

F. A. Courtenay, Jr., Rene S. Paysse, Leach, Grossel-Rossi & Paysse, New Orleans, La., James J. Donovan, Donovan, Maloof, Walsh, New York City, for Cargill, Inc.

Donald R. Kronenberger, Jr., Admiralty & Shipping Section Dept. of Justice, Washington, D. C., for U.S.A.

Donald L. King, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Stauffer Chemical Co.

**406**

Charles E. Leche, Normann & Normann, New Orleans, La., for Weivil-Cide Co. and Research Products Co.

## OPINION ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

ALVIN B. RUBIN, District Judge:

On October 8, 1973, the M/V La Molinera was moored alongside the lower berth of the Public Grain Elevator of New Orleans. After the loading of grain commenced, samples revealed the presence of weevils in the grain. Representatives of the New Orleans Board of Trade and representatives of the Department of Agriculture refused to certify the grain unless the condition was corrected. Accordingly, loading was stopped, and employees of the Public Grain Elevator treated the cargo in Holds Nos. 1 and 2 of the vessel with "Max-Kill High-Life" insecticide, a product regularly used for many years in this area.

The next day, the holds were opened, and Hold No. 2 was inspected. One of the inspectors became dizzy, and all persons left the hold. The other members of the party had no complaints; they waited approximately 10 minutes, re-entered the hold, and checked three samples.

Finding that the weevils in these samples were dead, the samplers employed by the New Orleans Board of Trade again entered Hold No. 1. Two of them, Edwin Raymond Fitzgerald and Nolan Gerard Pritchard, fell unconscious while in the hold. They were taken to a hospital, but were there pronounced dead as a result of being overcome by carbon tetrachloride poisoning. Carbon tetrachloride is the principal ingredient of the insecticide used to fumigate the ship.

These two workers were covered by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., under which compensation has been paid. Their representatives have sued the vessel owner, Marine Trading,

and the charterer on the basis of negligence. In addition they have sued the executive officers of the Board of Trade, on the basis that they were personally negligent, the Public Grain Elevator, for negligence, and others who are not involved in the motions before the court.

The Public Grain Elevator has filed a cross claim against all of the other defendants, including the Board of Trade (the decedents' employer) and its executive officers. The vessel owner, Marine Trading, and others of the co-defendants have filed similar cross claims.

These broadsides of claims and cross claims have elicited a cross fire of motions. We deal with them separately.

## I. REPRESENTATIVES' CLAIMS AGAINST THE EXECUTIVE OFFICERS OF DECEDENTS' EMPLOYER

Section 33(i) of the LHWCA, 33 U.S. C. § 933(i) provides:

The right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person in the same employ: *Provided*, that this provision shall not affect the liability of a person *other than an officer or employee of the employer*. (Emphasis supplied.)

Applying this section, the Court held in Keller v. Dravo Corporation, 5 Cir. 1971, 441 F.2d 1239, cert. den. 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665, that Section 933(i) prohibited any claim against an executive officer of the employer. Earlier, in Hughes v. Chitty, E.D.La.1968, 283 F.Supp. 734, 737, affirmed 5 Cir. 1969, 415 F.2d 1150, one of the judges of this district had held that executive officers of the employer "are immune under the act from suit by injured employees." Although the act was amended in 1972, the protection provided to executive officers by Section 933(i) was left unimpaired.

*Accordingly the motions to dismiss these claims are GRANTED.*

## II. THE VESSEL OWNER'S CROSS CLAIM AGAINST THE EXECUTIVE OFFICERS OF THE BOARD OF TRADE

While Section 5 of the LHWCA was amended in 1972, as more fully discussed below, Section 5(a) incorporates the language of the earlier statute with respect to the employer's liability: the "liability of such employer to . . . anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury" is limited to compensation payments. The owners were mindful that Section 5 has been held by the Fifth Circuit and this court to bar a tort indemnity claim against the employer, Ocean Drilling & Exploration Co. v. Berry Brothers Oil Field Service, Inc., 5 Cir. 1967, 377 F.2d 511, cert. denied 1967, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118; Aetna Casualty & Surety Co. v. Service Contracting, Inc., 5 Cir. 1973, 490 F.2d 299; Santoy v. Shell Oil Co., E.D.La.1974, 386 F.Supp. 905. They therefore did not cross claim against the Board of Trade. But they did seek indemnity or contribution from the Board's executive officers. The cross claim is based on various theories that can best be separately discussed.

### Indemnity

Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 25, 66 S.Ct. 872, 90 L.Ed. 1099, and its successors [1] established the liability of a vessel for what became known as the breach of the warranty of seaworthiness. In fact no warranty, this doctrine was a species of delictual liability without fault: those who enjoyed seamen's status, whether Jones Act (or "blue water" seamen) or shore based persons doing seamen's work (variously called constructive, quasi, or Sieracki seamen) were entitled to recover from the vessel in tort if the vessel, its gear, or appurtenances were not reasonably fit for their intended use without regard to negligence of the owner. Since in many instances the unseaworthy condition was created by or could best be guarded against or eliminated by the companies that came aboard the vessel to render services, such as stevedores, *Sieracki* was followed by Ryan Stevedoring Co. v. Pan Atlantic SS Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, which read into the contract between the vessel owner and the contractor a warranty that it would perform the contract in a workmanlike manner; if the contractor did not, then it owed indemnity to the vessel or its owner for any liability created by a breach of this warranty, including claims of the contractor's employees, in spite of the explicit language of the LHWCA that an employer's exclusive liability to an employee covered by the Act was for compensation. Fault was not required to establish a breach of the warranty of workmanlike service; a contractor could be held liable when no negligence on his part could be proved, as where equipment with latent defects was brought aboard the vessel. Italia Societa Per Azioni Di Navigazione v. Oregon Stevedoring Co., 1964, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732.

In an industry where insurance is almost universal, the tort claim against the owner was defended by its insurer; the insurer sought indemnity from the stevedore, to be borne by the stevedore's insurer; and the total cost of insurance was passed on to the vessel in the form of higher costs for stevedoring services. The inequities to which this involute pattern led, and its ultimate cost, resulted in a series of compromises that comprised part of the 1972 amendments to the LHWCA. Compensation benefits to the injured worker were increased both directly by higher weekly benefits and indirectly in a number of other aspects. While section 905(b) preserved the injured worker's action against the

---

1. See George, Ship's Liability to Longshoremen Based on Unseaworthiness—Sieracki through Usner, 32 La.L.Rev. 19 (1971).

vessel and its owner if negligence on the part of vessel personnel could be shown, the action against the vessel and its owner on the basis of unseaworthiness was eliminated.

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and *the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void* . . . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter. 33 U.S.C.A. § 905(b), as amended Oct. 27, 1972, Pub.L. 92–576, § 18(a), 86 Stat. 1263. (Emphasis supplied.)

■ Since liability of the vessel interests would be based entirely on their own fault, and their liability without fault had thus been eliminated, the implied *Ryan* indemnity of the employer was eradicated by the underlined phrase, and, in addition, any express contractual warranties were prohibited.

The legislative history clearly shows the Congressional intent. The House Report states:

> The Committee also believes that the doctrine of the *Ryan* case, which permits the vessel to recover the damages for which it is liable to an injured worker where it can show that the stevedore breaches an express or implied warranty of workmanlike performance is no longer appropriate if the vessel's liability is no longer to be absolute, as it essentially is under the seaworthiness doctrine. Since the vessel's liability is to be based on its

own negligence, and the vessel will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker.

> Furthermore, unless such hold-harmless, indemnity or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provisions of Section 5 of the Act by requiring indemnification from a covered employer for employee injuries.

> Accordingly, the bill expressly prohibits such recovery, whether based on an implied or express warranty. It is the Committee's intention to prohibit such recovery under any theory including, without limitation, theories based on contract or tort.

But it is contended that, while the employer is liable neither directly in tort to the injured LHW, nor in indemnity to the shipowner, and while, for reasons set forth above, the claimant may not sue executive officers of the employer directly in tort, it is still possible for the vessel or its owners to assert a cause of action against the executive officers in tort. When Congress sought to batten the hatches, this argument runs, it left one open, deliberately or inadvertently.

To recognize this cause of action would permit the shipowner in at least some circumstances to circumvent section 905(b), and to shift the financial responsibility for its negligence to the employer's officers. Yet the employer, section 905(b) states, shall not be liable directly *or indirectly*. Since the executive officers would almost invariably in fact be insured by the employer's insurer and their exposure would be reflected in the cost of its insurance, the executive officer suit would in economic reality be one of those indirect suits against the employer prohibited by 905(b).

Marine Trading, the vessel owner, invokes the kind of distinction known in law school as the red pony or goose case rule: Section 905(b) is inapplicable here because this case involves grain inspectors while 905(b) reaches, and was intended to reach, only persons employed to render stevedoring, ship building, or ship repair services. The argument relies on further language contained in section 905(b):

> If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no .such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel.

This interpretation would limit the word "employer" (who "shall not be liable") in Section 905(b) to employers of the types of employees specifically mentioned in the later sentences. This argument would prove too much, for it would mean that any other kind of worker, or, in the case of death, his representative, could sue his employer in tort. That does not appear to be a proper interpretation either of the express words used or the legislators' intention.

The immediate purpose of this part of the statute was to affirm the doctrine of Reed v. S.S. Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448, that a workman employed directly by the shipowner as a stevedore, repairer, or builder, will have the same rights as a workman employed by a stevedoring, repairing, or building company, neither more nor less.

> The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme Court, in *Reed v. S.S. Yaka*, 373 U.S. 410 [83 S.Ct. 1349, 10 L.Ed.2d 448] (1963) and *Jackson v. Lykes Bros. Steamship Co.*, 386 U.S. 371 [731] [87 S.Ct. 1419, 18 L.Ed.2d 488] (1967), held that the unseaworthiness remedy is available to the injured employee. The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he was employed directly by the vessel or by an independent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed directly by the vessel. The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen or ship builders or repairmen as apply when an independent contractor employs such persons. Senate Comm. on Labor & Public Welfare, Longshoremen's & Harbor Workers' Compensation Act Amendments of 1972, S.Rep.No.1125, 92d Cong. 2d Sess. 11 (1972).

Thus, where the vessel owner employs his own longshoremen or ship repairmen, and one of these employees is injured by the negligence of a member of the crew of the vessel, the injured employee may sue his employer; the suit against the vessel owner is not to be denied because the usual scheme of structuring the employment relationships along the waterfront is not followed.

There appear to be neither words in the statute to suggest nor design in it to be accomplished by the interpretation that persons who work aboard a vessel rendering some other kind of service than stevedoring, shipbuilding, or ship repair services continue to have rights now denied to those who

render such services. If these employees may not sue their employers, or their employer's executive officers directly, the vessel owners have no third party claim against either the employer or the employer's executives for indemnity in tort.

### Contractual Indemnity

■■ Determined to seek out every bywater, however slack, Marine Trading argues that it is entitled to indemnity from the executive officers on the theory that somehow they have a *Ryan*-type implied obligation. Since *Ryan* indemnity is true contractual indemnity, incorporating an additional term into a conventional obligation by implication, this argument assumes the existence of some kind of contract involving the executive officers. There was of course no such contract. Nor can it be postulated that Marine Trading is some sort of third party beneficiary of the officers' duties to their employer.

### Contribution

■ Marine Trading suggests that the executive officers may be joint tortfeasors, and thus owe contribution. The theory will neither fly nor float. Cooper Stevedoring Co. v. Fritz Kopke, 1974, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694; Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 1952, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318.

Therefore the owner's claims against the executive officers are dismissed.

### III. THE CHARTERER'S CLAIMS AGAINST THE EXECUTIVE OFFICERS

These claims encounter the same reefs as the vessel owner's. The claims are dismissed for the reasons set forth above.

### IV. NEW ORLEANS PUBLIC GRAIN ELEVATOR V. EXECUTIVE OFFICERS

The plaintiffs have sued Public Grain, the fumigator, for its negligence. Public Grain seeks to recover in turn from the executive officers of the Board of Trade. Here again it is necessary to discuss separately each possible theory on which liability might be asserted.

### Tort Theory of Indemnity

Section 905(b) does not deal in any way with this sort of claim for it treats only claims based on negligence of a vessel (or its owners) and unseaworthiness. The House Report emphasizes repeatedly that the 1972 amendments were designed to eliminate indemnity claims by shipowners, and nowhere are other third party claims referred to.

Public Grain, the fumigating company, cannot claim indemnity from the Board of Trade, the employer of the decedents, because of the provisions of Section 905(a), discussed above. However Section 905(a) limiting the liability of employers to compensation payments is not phrased in the embracive language used in Section 905(b) prohibiting claims against the employer directly or indirectly where indemnity is sought. Hence the Public Grain cross claim against the executive officers of the Board of Trade is not prohibited by the bulwark of Section 905(b).

None can gainsay that, as argued by Public Grain, the Board of Trade is neither a stevedore, shipbuilder or ship repairer. Employees of the Board of Trade are not longshoremen nor were they engaged in the building and repair of ships. Neither the Grain Elevator nor the Board of Trade is the owner or operator of a vessel. But while this defines the issue as outside the scope of Section 905(b), it does not dispose of it.

This claim must be determined by the reach of Section 905(a). As set forth above, the employer is immune from direct suit by the injured employee, and from indemnity claims by third parties sued by its employees; its executive officers, as fellow employees, are immune to direct suit by the covered employees. The covered employee must seek compensation from his employer or damages in

tort from third parties who may not seek indemnity from the employer, and, in at least many instances, as set forth in 905(b), from the employer's executive officers. To permit a third party action against the employer's executive officers when the defendant in the main action is adventitiously not the vessel would create a strange anomaly. Furthermore, to allow indemnity against the executive officers would circumvent the principle at the heart of the compensation plan: in return for guaranteeing the injured employee a no-fault remedy, the employer is promised that he need not insure against damage actions by his injured employees. As pointed out above, the liability insurance policies for companies engaged in the kind of work here involved usually include clauses extending protection to executive officers of the company insured, thus the liability of executive officers would ultimately be visited upon the employer in the form of higher insurance premiums.

█ As now traced out, the pattern of the LHWCA is that the burden of employee injury must rest on the employer, but its liability is restricted to compensation; the burden of injuries caused by the fault of a third party rests on the third party without recourse to risk shifting. It would be inconsistent with this pattern to permit this isolated type of risk shifting. The issue can by no means be resolved categorically, but on principle, it appears consonant with the pattern and purposes of the LHWCA not to permit this claim.

*Contractual Theory of Indemnity*

█ A claim based on this theory fails because there is no contract with the executive officers.

*Contribution*

*Cooper Stevedoring, Halcyon* and *Santoy,* supra, bar contribution from the employer. The rationale by which tort indemnity claims against fellow workers, albeit executives, is banned also forbids these claims.

## V. THE THIRD PARTY V. THE EMPLOYER: PUBLIC GRAIN V. NEW ORLEANS BOARD OF TRADE

█ For the reasons discussed above, Public Grain has no claim for tort indemnity or contribution against the employer. See *Ocean Drilling, Santoy, Cooper Stevedoring, Halcyon,* supra.

█ However, since Section 905(b) applies only when the "negligence of a vessel" is at issue and since Section 905(a) has never been held to prohibit a contractual indemnity provision, a claim based on an express agreement to provide indemnity might state a cause of action. No such contract is alleged here.

█ *Ryan*-type, implied indemnity, must be distinguished from express conventional indemnity, for the Fifth Circuit has repeatedly held that the "predicate" for applying *Ryan* indemnity principles is the "absolute nondelegable liability" imposed on the shipowner under the *Sieracki* seaworthiness doctrine. See *Ocean Drilling,* supra; Loffland Brothers Co. v. Roberts, 5 Cir. 1967, 386 F.2d 540, cert. den. 389 U.S. 1040, 88 S. Ct. 778, 19 L.Ed.2d 830; General Electric Co. v. Cuban American Nickel Co., 5 Cir. 1968, 396 F.2d 89; Smith Petroleum Service, Inc. v. Monsanto Chemical Co., 5 Cir. 1970, 420 F.2d 1103; Hobart v. Sohio Petroleum Co., 5 Cir. 1971, 445 F.2d 435, cert. den. 404 U.S. 942, 92 S. Ct. 288, 30 L.Ed.2d 256. These cases emphasize that the *Ryan* doctrine was developed "to alleviate the harshness of *Sieracki* absolute liability against shipowners in situations when the shipowner has relinquished control of his vessel and another party is better situated to prevent losses by shipboard injuries." *Hobart,* supra, 445 F.2d at 438. Therefore unless the defendant owes a nondelegable, absolute liability (i. e. where the defendant is liable regardless of fault) there is no *Ryan* implied warranty of workmanlike performance. Since the employer, New Orleans Board of Trade, contracted for no services that would ex-

pose Public Grain to liability without fault, its contract did not gestate a *Ryan* type warranty of workmanlike performance. Hence the claims by Public Grain against the Board of Trade are dismissed.

Because of the complexity of the decree, counsel for the plaintiffs will prepare a single decree covering all of the rulings herein, submit it to all other counsel for concurrence or objection, and then file it with the court, either noting unanimous concurrence, or attaching the objections advanced and the reasons furnished for each.

## ON MOTION TO CERTIFY APPEAL

In a letter to the court, counsel for the Public Grain Elevator requested that the court state that the order of the court dismissing the Elevator's third party claim against the Board of Trade involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, and to certify that issue to the Court of Appeals for an interlocutory appeal under 28 U.S.C. § 1292 (b). For the reasons that follow, that request is DENIED.

■ Section 1292(b) is applicable only to "orders not otherwise appealable under this section." Section 1292(a)(3) permits appeals of "[i]nterlocutory decrees . . . [in] admiralty cases in which appeals from final decrees are allowed . . . ." The order of the court dismissing the Public Grain Elevator's third party complaint on the merits is appealable under § 1292(a)(3). Gloria S. S. Co. v. Smith, 5th Cir. 1967, 376 F.2d 46. It would therefore seem that this Court cannot certify the appeal under § 1292(b). See 9 Moore, Federal Practice ¶ 110.22[2].

■ It is not necessary to rest the decision on this narrow ground, however. Implicit in the Public Grain Elevator's request for certification of the issue for an interlocutory appeal is a request that the court stay further proceedings in the case while the appeal is taken. Such a stay may be granted by the district court if the appeal is taken under § 1292(a)(3). See Phelan v. Taitano, 9th Cir. 1956, 233 F.2d 117; DePinto v. Provident Security L. I. Co., 9th Cir. 1967, 374 F.2d 50. If the appeal is taken under § 1292(b), a stay of the proceedings may be granted either by the district court or the court of appeals. But in any event, the staying of proceedings pending an interlocutory appeal is exceptional, not the rule as with an appeal from a final decree.

■ The final determination of an appeal requires a great deal of time. F.R.App.P. 12 gives a party 40 days from filing the notice of appeal to take the necessary steps to have the appeal docketed. In the Fifth Circuit, this is followed by a delay averaging nine months until final disposition. 1974 Annual Report, Administrative Office of the United States Courts, Table 5B. In the case of an appeal taken under 1292 (b), an additional month or so must be added for the Court of Appeals to consider the merits of allowing the appeal. Many things can take place during this time—witnesses disappear, memories fade, and parties are forced to suffer the uncertainty of pending litigation. Trial in this matter has been set. The plaintiffs do not seek a stay of the proceedings. Delay of the matter pending appeal would deny the plaintiffs their timely day in court, for which they are now ready, primarily to enable defendants to litigate among themselves on whom the burden either of judgment or expense rests. Finally, the whole purpose of certification under 1292(b) is to advance ultimate determination of the cause. That likewise would be a consideration under 1292(a)(3). I am not persuaded that this would be accomplished by staying the trial. The delay of justice is injustice. No such delays shall be granted by this court if an appeal is taken under 28 U.S.C. § 1292(a)(3).