**Dwain B. BAKER, Plaintiff,**

v.

**PACIFIC FAR EAST LINES, INC., Defendant.**

**No. C–76–1555 WHO.**

United States District Court, N. D. California.

April 6, 1978.

---

**7.** *Id.*

Morton L. Silvers, San Francisco, Cal., for plaintiff.

George M. Perrochet, John Shea Pierce, Acret & Perrochet, San Francisco, Cal., for defendant.

## OPINION

ORRICK, District Judge.

This case poses the important question whether a person performing the duties of a longshoreman, after passage of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* ("LHWCA"), may maintain a negligence action against his employer (who also happens to be the vessel owner) to recover damages for injuries incurred during the course of employment. This question of first impression in this Circuit we answer in the negative, holding that Congress intended by the 1972 Amendments to eliminate the possibility of direct employee versus employer lawsuits and to limit the longshoreman to the workers' compensation-type benefits provided under the LHWCA.

Procedurally, the question comes before the Court on plaintiff's motion for leave to file an amended complaint and defendant's motion to enter judgment. Plaintiff, Dwain B. Baker, originally filed this action under the Jones Act, 46 U.S.C. § 688 *et seq.* Defendant, Pacific Far East Lines, Inc. ("PFEL"), in answering plaintiff's complaint, not only denied that plaintiff had sustained any injuries [1] while employed by

---

1. Plaintiff alleges that he was injured on two separate occasions while cleaning defendant's barges. He first sustained injury when he fell from a ladder which was missing a rung. Ap-

defendant, but also put in issue the threshold question whether plaintiff could even qualify as a Jones Act seaman. After an evidentiary hearing, the Court found that plaintiff did not qualify as a Jones Act seaman, whereupon plaintiff moved the Court for leave to file an amended complaint sounding in negligence against his employer, and defendant moved the Court to enter judgment. For the reasons hereinafter stated, the Court denies plaintiff's motion and grants defendant's motion.

## I.

We first address the question whether plaintiff was a "seaman/crew member" within the meaning of the Jones Act.

## A.

From April, 1975, through July 11, 1975, plaintiff was employed as a "casual" member of PFEL's maintenance and repair gang, sometimes referred to as the "shore gang." He had been dispatched by his union, the Sailors Union of the Pacific, as a casual replacement for, or supplement to, defendant's regular shore gang personnel. Plaintiff worked on an as-needed basis three to five days per week, performing such tasks as his supervisors directed. He was paid on an hourly basis, whereas regular shore gang members were paid on a weekly basis. Plaintiff, who lived, ate, and slept on shore, never replaced, even on a temporary basis, any member of the crew of any vessel.

The shore gang was divided into two separate groups—a "van" or "container" gang and a "barge" gang. During the period surrounding his injuries, plaintiff worked with the barge gang. Daily work orders and assignments for the shore gang typically originated with defendant's port engineer who was, in effect, the manager of the gang. These orders and assignments were relayed to members of the barge gang by the bosun, who was the gang foreman. Members of the gang were *not* responsible

to, or given orders by, any officers or masters of any vessels.

The barge gang spent most of its time painting, cleaning, scraping, and generally maintaining the interiors of defendant's "LASH" (lighter aboard ship) barges moored at Pier 96 of the Port of San Francisco. Although the barge maintenance work was usually performed when the barges were tied to the pier, at times it was done while the barges were stored in racks on land. The purpose of such maintenance was to keep the cargo free of contamination and the vessels fit for navigation.

The LASH barges are large floating containers lacking quarters or motor power of their own, which are used principally to transport defendant's cargo back and forth between the pier and the LASH ship. They are loaded, unloaded, cleaned and maintained at Pier 96; barge tows or tugs transport them between the pier and various LASH ships, aboard which they are hoisted by cranes. The LASH barges had no operational crew at any time material herein. Although a "master" was designated on Coast Guard registration papers for each barge, said master did not have any duties with respect to the barge's maintenance, repair or operation. The LASH barges are not assigned to specific LASH ships.

Although the primary work of the barge gang was barge cleaning and maintenance, the gang performed other tasks such as moving and refinishing furniture, painting traffic control lines on the pier, handling and splicing mooring lines, sandblasting, operating forklifts and other vehicles, assisting in annual inspection activities aboard various of defendant's ships, and painting the hulls and sides of such ships in port. Other work, such as performing welding repairs, loading and unloading cargo, and transporting the barges around the Bay, is performed by independent contractors or longshoremen, not by the shore gang.

proximately one week later, plaintiff slipped on a "slippery foreign petroleum substance, which

had been allowed to accumulate [on the barge]."

As a casual member of defendant's shore gang, plaintiff spent more than ninety percent of his overall work time cleaning and maintaining the insides of defendant's LASH barges, and cleaning and painting the hull, trim and equipment of defendant's ships.[2] Plaintiff performed this work while the barges and ships were moored at Pier 96. Neither plaintiff nor any other member of the shore gang was assigned to a specific barge or group of barges on anything remotely resembling a permanent basis. Rather, they were given a series of temporary, task-oriented assignments on constantly shifting barges. Since the cleaning and maintenance of any given barge is a short-term project, plaintiff rarely, if ever, worked on a single barge for more than a few consecutive hours.

Plaintiff was dispatched and assigned through his union to the barge gang and not to a specific, identifiable barge or group of barges. Defendant kept no records of the specific barges on which a particular shore gang member worked on a given day. Plaintiff himself is apparently unable to identify which barges he cleaned or maintained on any particular day; indeed, he did not know from day to day during his employment which barges he would be assigned to, or even if he would be working on barges. During each of the two days on which plaintiff claims to have sustained injuries, he worked on more than one barge. Although plaintiff knows he was injured aboard two of defendant's barges, he appears unable to identify *which* barges.

### B.

■ The test to be applied by the trier of fact in determining "seaman" status for Jones Act purposes is as follows: first, there must have been a vessel in navigation; second, the plaintiff must have been aboard the vessel primarily to aid in navigation; and, third, the plaintiff must have

had a more or less permanent connection with the vessel or with a specific group of vessels. *E. g., Whittington v. Sewer Construction Co., Inc.,* 541 F.2d 427 (4th Cir. 1976); *Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir. 1959); *Lewis v. Roland E. Trego & Sons, Inc.,* 359 F.Supp. 1130, 1132 (D.Md.1973), *modified,* 501 F.2d 372 (4th Cir. 1974); 1B Benedict on Admiralty § 11 (7th ed. 1976).

■ As a preliminary matter, the Court notes that plaintiff's assertions that he was formerly a "seaman" by occupation and that he intended to resume such status at some point in the future, even if true, do not determine the issue before this Court. *Sullivan v. American President Lines, Ltd.,* 206 F.Supp. 547 (N.D.Cal.1961). Similarly, the facts that plaintiff was a member of a seafaring union at the time of his injuries and that he was doing work which a seaman might also perform are not controlling. *Id.; Whittington v. Sewer Construction Co., supra,* 541 F.2d at 433.

■ The application of the aforementioned three-pronged test, on the other hand, is determinative. With respect to the first prong, barges have consistently been considered "vessels" for purposes of admiralty jurisdiction; equally important, vessels have often been held to be "in navigation" even though moored to a dock. *Id.* at 436 n.14; *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). Here, the barges upon which plaintiff worked typically were tied up alongside Pier 96 on a short-term basis, waiting to be towed across San Francisco Bay to defendant's LASH ships. The docked ships upon which plaintiff occasionally worked were also between voyages. Thus, both the barges and the ships satisfy the "vessel in navigation" requirement.

---

**2.** Plaintiff testified that during his years as a "blue-water seaman" on seagoing vessels, he performed work which was almost identical to certain shore gang work, such as painting and scraping decks, cleaning holds and painting superstructures. There was also testimony that

the shore gang performed tasks similar to some of those listed in the agreement between the S.U.P. and the Pacific Maritime Association as constituting the "scope of work" of "blue-water seamen."

The second part of the seaman test—"primarily aiding in navigation"—has been so liberally construed that "cooks, drillers, and musicians, as well as other persons not subject to being tattooed like ordinary seamen" have been found to be Jones Act crew members. *Perez v. Marine Transport Lines*, 160 F.Supp. 853, 855 (E.D.La.1958). Subsequent cases have noted that this requirement has been so broadly construed that the words have lost their natural meaning. *E. g., Offshore Co. v. Robison, supra*, 266 F.2d at 780. Citing *Perez*, the Court in *Mietla v. Warner Co.*, 387 F.Supp. 937, 939 (E.D.Pa.1975), stated that "[w]e have no difficulty in concluding that a dock worker who helps maintain a vessel aids in navigation." In order to satisfy this requirement, the duties of the plaintiff must have contributed to the vessel's function or to the accomplishment of its mission. *See Offshore Co. v. Robison, supra*, 266 F.2d at 779. In the case at hand, plaintiff's primary duties were cleaning, scraping, painting, and maintaining defendant's barges and ships, which were temporarily moored to the pier. The Court is compelled to conclude, in light of the liberal stance adopted by *Perez* and subsequent cases, that plaintiff's duties contributed to the mission of the vessels upon which he worked and that, therefore, he was aboard primarily to aid in their navigation.

With respect to the third requirement of a "more or less permanent connection," evidence of sporadic contacts for brief periods of time with water-borne vessels is insufficient to support a finding of seaman's status; rather, there must be a showing that plaintiff performed a significant part of his work aboard the vessel with some degree of regularity and continuity. *Holland v. Allied Structural Steel Co.*, 539 F.2d 476 (5th Cir. 1976), *cert. denied*, 429 U.S. 1105, 97

S.Ct. 1136, 51 L.Ed.2d 557 (1977). Although this "connection" can be with several identifiable ships or with a specific fleet of ships, as opposed to a single vessel, such relationship must be "substantial in point of time and work." *Braniff v. Jackson Ave.-Gretna Ferry, Inc.*, 280 F.2d 523, 528 (5th Cir. 1960). Sporadic contact with "several identifiable vessels" will not suffice. *Id.*

In the instant case, plaintiff was hired on an as-needed basis and was paid an hourly wage. He lived, ate, and slept on shore. Plaintiff took orders from a shore-based bosun, not from a ship's officer. He did not replace any "blue-water seaman," but rather, supplemented the regular members of the shore gang. Plaintiff was assigned by the union not to a specific vessel or vessels, but to the shore gang. Although more than ninety percent of his overall time was spent working on barges or ships, he rarely spent more than several consecutive hours aboard any given vessel. Plaintiff's assignments were temporary and task-oriented; he did not know from day to day which particular barge or barges he would be working on, or whether he would even be assigned to a barge. His connection with defendant's vessels was clearly sporadic. Moreover, the specific fleet of vessels which plaintiff claims to have been connected with consisted of five hundred to one thousand barges and eight LASH ships scattered worldwide.[3] Beyond this, plaintiff failed to identify a barge or a reasonably specific group of barges to which he was regularly assigned or for which he had any degree of continuing responsibility.[4] He was unable to identify which particular barge or barges he cleaned or maintained on any given day, and is unable to clearly identify those upon which he sustained his injuries.

In sum, plaintiff's situation is governed by Judge Wisdom's statement of the law:

**3.** One court has indicated that the number of vessels involved might have a bearing on the trier of fact's ultimate determination regarding seaman's status. *I. e.*, the greater the number of vessels involved, the less likely it is that the requisite "connection" can be found. *See Mietla v. Warner Co.*, 387 F.Supp. 937 (E.D.Pa. 1975).

**4.** Plaintiff asserts that we could find him to have been connected with vessels "identifiable" as the group of barges at Pier 96, or alternatively, as the group of barges in port upon which the barge gang worked at any given time. This shows that plaintiff's connection could only have been with either the barge gang or Pier 96, and *not* with a sufficiently specific fleet of vessels.

"[T]he cases in which this Court has found the permanency requirement a fatal stumbling block have largely involved land-based workers providing shore services to docked vessels. In *Thibodeaux v. J. Ray McDermott & Co.*, 5 Cir. 1960, 276 F.2d 42, the Court reasoned that the decedent had a transitory relation to the barge on which he was injured where he was a regular shore worker who ate, slept, and lived at home, was not assigned to any particular vessel, and had worked only four days loading and securing deck cargo on unmanned barges. Similarly, this Court sustained a directed verdict for the defendant on the seaman issue in *Burns v. Anchor-Wate Co.*, 5 Cir. 1972, 469 F.2d 730, because the plaintiff, a talleyman at a pipe-coating yard, who never worked more than two or three hours aboard any particular barge and never slept or ate aboard the barges or towing vessels, was not permanently assigned to the barge on which he was injured." *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 327–28 (5th Cir. 1977).

Accordingly, the Court holds that plaintiff was not a "seaman/crew member" within the meaning of the Jones Act.

## II.

Since plaintiff cannot maintain his action under the Jones Act, we turn now to his motion for leave to file an amended complaint under the LHWCA alleging negligence on the part of his employer, the vessel owner. Plaintiff charges that defendant negligently failed to remedy certain alleged dangerous conditions aboard several of its barges which allegedly caused plaintiff's injuries.

 Rule 15(a) of the Federal Rules of Civil Procedure provides that once responsive pleadings are served, a party seeking to amend his or her complaint must first obtain leave of the court. Although the grant or denial of leave to amend is within the discretion of the trial court, under normal circumstances such permission should be freely granted. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, where the proposed amendment is insufficient in law and would thus be a useless act, it is proper, at least in this Circuit, to deny leave to amend. *Gilbertson v. Fairbanks*, 262 F.2d 734, 740 (9th Cir. 1959); *Holmes v. Henderson*, 145 F.Supp. 832, 837 (D.Nev.1956), aff'd 249 F.2d 529 (9th Cir. 1957); *see also Vickery v. Fisher Governor Co.*, 417 F.2d 466, 470 (9th Cir. 1969). The proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6) or (f): if there is no set of facts which could be proved under the amendment to the pleadings which would constitute a valid and sufficient claim or defense, leave should be denied. 3 Moore's Federal Practice ¶ 15.08[4] (2d ed. 1974). It therefore becomes necessary to examine the legal sufficiency of plaintiff's proposed cause of action. Since, as will be seen from the discussion below, this proposed amendment cannot withstand a Rule 12(b)(6) motion to dismiss, leave to amend the complaint is denied.

## A.

Congress passed the LHWCA in 1927 to provide income security for maritime employees who are injured upon the navigable waters of the United States.[5] Being modeled after the New York Compensation Act, the LHWCA embraces the fundamental principles underlying the state workers' compensation systems. G. Gilmore & C. Black, The Law of Admiralty 408 (2d ed. 1975). The injured employee is automatically entitled to compensation in an amount set by a statutory benefits schedule. This right of recovery is not impaired by either the employee's contributory negligence or the employer's faultlessness. In return, the employee gives up his common law right to

---

**5.** Coverage is also available if the injury occurs upon an adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used in loading, unloading, repairing, or building a vessel. 33 U.S.C. §§ 902(4), 903(a).

sue his employer in tort, thereby assuring the employer of a fixed liability sufficiently predictable as to allow him to insure against his probable costs. The fact that litigation can be avoided lowers even further the price of industrial mishaps to the parties and to society. Thus, from the very outset, the LHWCA provided that an employer's liability for compensation under the Act was to be "exclusive and in place of all other liability" to an injured longshoreman or harbor worker.[6] 33 U.S.C. § 905(a). However, when some person other than the employer is liable for the worker's injury, the worker is permitted to recover against "such third person;" the worker is not forced to elect between his right to compensation under the LHWCA and his right to sue for damages.

Congress' enactment of this legislation was only the first chapter in a continuing drama. The Supreme Court, in a series of decisions spanning two decades, emasculated the exclusive liability provision. In *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) (Stone, Frankfurter, Burton, JJ. dissenting), the plaintiff, employed by an independent stevedoring company which was under contract to load a certain ship's cargo, was injured when struck by a falling boom and tackle. The Supreme Court held that the obligation of seaworthiness,[7] traditionally owed by a ship owner to seamen, extended to longshoremen injured while working aboard the ship. Ten years later, the Court held that a ship owner who was forced to pay off a *Sieracki* claim brought by a longshoreman injured by the unsafe storage of cargo could recover full indemnity from the stevedoring company for whom the longshoreman worked. There was an implied warranty of workmanlike performance running from the stevedore employer of the vessel. *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (Black, Warren, Douglas, Clark, JJ. dissenting). The Court was unpersuaded by arguments that its ruling caused the economic burden of the longshoreman's recovery to fall on the stevedore *employer* contrary to the exclusive liability provision of the LHWCA.

The last, and perhaps most controversial, of the Supreme Court's decisions was *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) (Harlan and Stewart, JJ. dissenting). The injured longshoreman was employed not by an independent stevedore, but rather, by the vessel's bareboat charterer.[8] Plaintiff brought an *in rem* action against the vessel; the owner responded by

---

**6.** 33 U.S.C. § 905, as originally enacted, provided:

"The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, nor that the employee assumed the risk of his employment, nor that the injury was due to the contributory negligence of the employee."

The 1972 Amendments redesignated this section as Section 905(a), leaving the language otherwise unchanged. A subsection (b), containing entirely new provisions, was added.

**7.** As unseaworthiness was transformed in the mid-1940's from an obscure doctrine into a commonplace remedy, the ship owner assumed an absolute duty to furnish a vessel which was reasonably fit for the purposes of her voyage. It was immaterial how much diligence was used if it failed to make the ship safe. This doctrine thus made a ship owner the virtual insurer of his crew's safety. *See* 2 M. Norris, Law of Seamen § 615, at 172–73 (3d ed. 1970).

**8.** A "bareboat" or "demise" charter is an instrument which vests in the charterer the possession and control of the vessel while the other party retains general ownership and the right of reversion. The bareboat charterer is considered the owner *pro hac vice*, and, therefore, qualifies as the "owner" for purposes of those statutes relating to limitation of liability. G. Gilmore and C. Black, The Law of Admiralty at 239–242 (2d ed. 1975).

impleading the charterer, who was responsible for the unseaworthy condition, in the usual *Ryan* indemnity action. The Court held that the charterer, as owner *pro hac vice,* should not be allowed to avoid the obligation of seaworthiness. Thus, the longshoreman could recover damages *directly* from the owner *pro hac vice,* notwithstanding the fact that said owner was plaintiff's *employer. Yaka* thereby brought the law full circle: the "liberal" majority of the Supreme Court, out of its concern for victims of industrial accidents, had succeeded in repealing the LHWCA exclusive liability provisions, at least in unseaworthiness actions.[9]

Congress amended the LHWCA in 1972, substantially raising the benefits payable to injured employees. The exclusivity feature was carried forward, redesignated as 33 U.S.C. § 905(a).[10] Of equal importance was the addition of Section 905(b), which reads:

> "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person * * * may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to

the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

In return for the vast improvement in compensation payable under the LHWCA, Congress, in the fourth sentence of Section 905(b), took away the longshoreman's *Sieracki* third-party action for unseaworthiness. Ship owners, under the first sentence, instead of being held absolutely liable for injuries which occur to longshoremen while working on their vessels, would now be subject only to third-party negligence actions. According to the last sentence of Section 905(b), this cause of action is to be the longshoreman's exclusive remedy against a "vessel."[11] The last clause of the first sentence eliminates the vessel's right to indemnification from the longshoreman's employer, reflecting Congress' judgment that the doctrine of the *Ryan* case is no longer appropriate.

### B.

The 1972 Amendments make clear that unseaworthiness actions are no longer permissible, and that negligence actions against third-party vessels are authorized in their place. It is also manifest that Congress intended to restore the exclusive liability concept to its original scope, at least as far as the stevedore employers are concerned. But what of the situation, brought to the fore by plaintiff's proposed amended complaint, where the party being sued by the injured longshoreman is both a "vessel" *and* an "employer?" Is a vessel-employer liable both for compensation benefits and for negligence?

---

**9.** The Supreme Court reaffirmed *Reed v. The Yaka* in *Jackson v. Lykes Bros. Steamship Co.,* 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967).

**10.** For the statutory language, *see* note 6, *supra.*

**11.** The term "vessel" was newly defined by the 1972 Amendments as not only any vessel

"upon which or in connection with which" the longshoreman's injury or death may have occurred, but also "said vessel's owner, owner pro hac vice, agent, operator, charter, or bareboat charterer, master, officer or crew member." 33 U.S.C. § 902(21). Following the lead of the several courts which have issued opinions in this area, this Court will make use of the all-inclusive word "vessel."

Plaintiff reads Section 905(b) as permitting him to directly sue his employer, PFEL, for its alleged negligence in failing to correct certain allegedly dangerous conditions aboard its barges. The sentence on which he relies provides:

"In the event of injury to a person covered under the chapter caused by the negligence of a vessel, then such person * * may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title * * *." 33 U.S.C. § 905(b).

Some courts, most notably the Third Circuit in *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), have recognized the action that plaintiff seeks to bring. The *Griffith* court first pointed out that the word "vessel" had been defined by the 1972 Amendments to include not only the vessel itself, but also its owner *pro hac vice. Id.* at 39. After discussing several alternative constructions of Section 905(b), the court addressed the most formidable obstacle to recognizing a worker's negligence action against his employer: the presence of Section 905(a), which contains the exclusive liability language. Ever loyal to what it perceived as Supreme Court precedent, the *Griffith* court declared:

"But while logic and common sense suggest the literal application of § 905(a), the ghost of *Sieracki-Ryan* stands in the way. The Supreme Court has already construed the exclusive remedy provision as permitting a suit against a *pro hac vice* owner who has also an employer." *Id.* at 42.

The *Griffith* court then observed that Congress, which was aware of the eviscerating construction which *Yaka* had given to Section 905(a), "deliberately chose to deal with it only to the limited extent of the second sentence in § 905(b)." Thus, the Third Circuit reasoned that a vessel, even a vessel which is an employer under the LHWCA, is

liable for its own "owner-occasioned negligence," although it is relieved of liability resulting from the negligence of persons providing stevedoring, shipbuilding, or repair services. *Id.* at 43.

The Fifth Circuit, in *Smith v. M/V Captain Fred,* 546 F.2d 119 (5th Cir. 1977), reached a similar result, relying on a passage from the House Report:

"The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme Court, in *Reed v. S.S. Yaka,* 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) and *Jackson v. Lykes Bros. Steamship Co.,* 386 U.S. 731, 87 S.Ct. 1419, 18 L.Ed.2d 488 (1967), held that the unseaworthiness remedy is available to the injured employee. *The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he was employed directly by the vessel or by an independent contractor.* Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed directly by the vessel. *The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen or ship builders or repairmen as apply when an independent contractor employs such persons.*" H.R.Rep.No.1441, 92d Cong. 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News pp. 4698, 4705 (emphasis added).

The court apparently reasoned as follows: [12] the quoted language indicates that Congress wanted all longshoremen, regardless

---

12. The Fifth Circuit did not articulate its syllogism, stating summarily: "The House Report demonstrates that Congress intended the *Yaka* rule to survive." *Smith v. M/V Captain Fred,* 546 F.2d 119, 123 (5th Cir. 1977).

of whether employed directly by a "vessel" or by an independent contractor, to have identical remedies when injured; under Section 905(b) a longshoreman employed by an independent stevedore can sue the third-party vessel for negligence; therefore, an injured worker who works directly for the vessel owner should also be permitted to sue the vessel owner in negligence.

Other courts, sometimes in *dictum* and sometimes in direct holdings, have expressed approval of this new action for "owner-occasioned negligence," utilizing the reasoning of either *Griffith* or *Captain Fred,* or a combination thereof. *See Napoli v. Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Duncan v. Dravo Corp.,* 426 F.Supp. 1048 (W.D.Pa.1977); *Complaint of Allied Towing Corp.,* 416 F.Supp. 1207 (E.D.Va. 1976); *Fitzgerald v. Compania Naviera La Molinera,* 394 F.Supp. 402 (E.D.La.1974).

### C.

 Congress, in enacting the 1972 Amendments, has spoken with less than perfect clarity. The result, not surprisingly, has been repeated litigation. As indicated above, most courts which have considered the issues posed by the case at bar have concluded that an injured longshoreman can sue his vessel-employer in negligence. Nonetheless, this Court is convinced, after examining the statute and the legislative history, that Congress intended to restore the exclusive liability provision to its original meaning. We are unpersuaded by the arguments proffered in *Griffith* and *Captain Fred.*

Section 905(b) unequivocally replaces the longshoreman's unseaworthiness action with a negligence action, and eliminates the vessel's right to indemnification from the injured plaintiff's employer; this effective-ly overturns the *Sieracki* and *Ryan* cases. The second and third sentences of Section 905(b) appear to be Congress' attempt, admittedly awkward, to similarly overrule *Yaka.* We perceive the qualifying clause "if the injury was caused by the negligence of persons engaged in providing stevedoring services * * * [or] shipbuilding or repair services" as an error of overspecificity, rather than a license for longshoremen to sue their employers for "owner-occasioned negligence."[13]

A second reason for concluding that *Yaka* is no longer viable originates in *Arvidson v. Dillingham Corp.,* 462 F.2d 1 (9th Cir. 1972). The Ninth Circuit held that plaintiff painters injured in an explosion and fire on their employer's barge were barred from recovering for alleged negligence, because of the LHWCA's exclusive liability provision. The court recognized that *Yaka* permitted a longshoreman to directly sue the ship owner-employer, but held that this right of recovery was limited to the unseaworthiness context. *Arvidson v. Dillingham Corp., supra,* 462 F.2d at 4. *Accord, Haas v. 653 Leasing Co.,* 425 F.Supp. 1305, 1311 (E.D.Pa.1977). The Supreme Court evidently agrees. In explaining the relationship between *Yaka* and another prior decision, *Atlantic Coast Line R. Co. v. Erie Lackawanna R. Co.,* 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972), the Court stated:

> "[E]ven if Erie were negligent, its injured employee was entitled to claim compensation from it under the Harbor Workers' Act, and Erie was accordingly entitled to the protective mantle of the Act's limitation-of-liability provisions." *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 115, 94 S.Ct. 2174, 2179, 40 L.Ed.2d 694 (1974).

---

**13.** "The apparent purpose of the second and third sentences was to reverse *Reed v. The Yaka.* The language employed is somewhat confusing. Taken literally, it seems to say only that persons 'employed by the vessel' cannot recover for the negligence of their fellow workers engaged in the same operation (e. g., loading). (Presumably that proposition would be equally true for persons employed by an 'employer.') That leaves open the possibility that such persons could recover for negligence chargeable to the vessel, its crew, and so on, even though the 'vessel' is the 'employer.' That is not what the Committee seemed to think it was doing but sometimes statutory language turns out to have a life of its own, independent of the wishes of whoever wrote it down. The draftsman's persistent personification of 'the vessel' may have contributed to the confusion at this point." G. Gilmore & C. Black, The Law of Admiralty 450 (2d ed. 1975).

Although both *Arvidson* and *Cooper* involved actions brought pursuant to the pre-1972 LHWCA, there is no reason why their underlying reasoning should not have equal force today. Therefore, since the *Sieracki-Ryan-Yaka* decisions apply only in the unseaworthiness context, and since the 1972 Amendments eliminated unseaworthiness actions, it would seem the slate is wiped clean. The question of direct employee suits for employer negligence can be addressed by referring solely to the face of the LHWCA statute and its accompanying legislative history. The *Griffith* court's incantation of the *Sieracki-Ryan* ghost, justifying its holding that Congress did not intend to restore Section 905(b) to its original majesty, is misplaced.

Section 905(b) was written so as to carefully close off the possibility of indirect recovery against the employer through the route of a third-party suit, followed by indemnification. This feature arises in part from a desire that the exclusivity principle not be circumvented:

"Furthermore, unless such hold-harmless, indemnity or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provisions of Section 5 of the Act by requiring indemnification from a covered employer for employee injuries." H.R.Rep.No.1441, *supra,* at 4704; 118 Cong.Rec. 36273 (1972) (remarks of Rep. Williams).

Given that Congress worked so hard to preclude the possibility of indirect recovery, it would be anomalous if Congress had simultaneously allowed *direct* employee versus employer lawsuits. *See Murphy v. Woods Hole, Martha's Vineyard & Nantucket Steamship Authority,* 545 F.2d 235, 239 (1st Cir. 1976) (*dictum*).

In amending the LHWCA, Congress was trying to accommodate the wishes of three distinct groups: the unions, who felt the statutory benefits were too niggardly; the ship owners, who were upset with the Supreme Court decisions permitting maritime workers to use the doctrine of unseaworthiness to recover damages from ship owners regardless of fault; and the employers of

the longshoremen who had been required to indemnify the ship owners, and who wanted to regain the protection of the exclusive liability provisions. *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 2356, 53 L.Ed.2d 320 (1977). It is not surprising, then, that the legislative history contains numerous indications that the rejuvenation of the exclusivity principle (and the elimination of the unseaworthiness action) were the *quid pro quo* for the increase in LHWCA compensation benefits.

"While everyone has agreed since at least the mid-1960's that the benefits under this Act should be raised, there has been some dispute over the years as to whether such benefits should be raised so long as this compensation law was not the exclusive remedy for an injured worker. It has been the feeling of most employers that while they were willing to guarantee payment to an injured worker regardless of fault, they would only do so if the right of such payment was the exclusive remedy and they would not be subject to additional lawsuits because of that injury." S.Rep.No.1125, 92d Cong., 2d Sess. 4 (1972).

*See also* H.R.Rep.No.1441, *supra,* at 4699; 118 Cong.Rec. 36381 (1972) (remarks of Rep. Daniels); *id.* at 36382 (remarks of Rep. Eckhardt). In explaining the 1972 Amendments to his colleagues, Representative Eckhardt concluded with this revealing statement:

"Now, if this bill is passed, you wipe out these decisions of a quarter of a century. You wipe out the nondelegable duty of the ship to protect the worker, and you permit the ship to simply leave the entire job to the stevedoring company; *thereby, of course, limiting the remedy of the injured person to that afforded under the Longshoremen's and Harbor Worker's Act, which operates like ordinary workmen's compensation* and operates on a percentage of the earnings of an individual rather than reimbursing him for his actual injury, and puts a lid on his recovery." 118 Cong.Rec. 36383 (1972) (emphasis added).

The one excerpt from the House Report on which plaintiff might rely is, in this

Court's view, inconclusive. That passage was interpreted by the Fifth Circuit to mean that Congress intended to preserve *Yaka* actions under the new negligence scheme.[14] However, this language can be interpreted to require precisely the opposite result: since negligence actions are not permitted against stevedore-employers,[15] such actions should not lie against vessel-employers either. *See Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759, 766 (E.D.Pa. 1974).

An examination of the amended statute reinforces this Court's conclusion that Congress, by replacing unseaworthiness with the negligence cause of action, did not mean to open the door to a new form of direct employee versus employer litigation. The language of Section 905(a), which was unaltered by the 1972 Amendments, could not be any more absolute: the liability of an employer for statutory benefits "shall be exclusive and in place of all other liability of such employer to the employee." As conceded by the Third Circuit, Section 905(a) does not contain an exception for Section 905(b) liability of a party who is simultaneously an "employer" and a "vessel." *Griffith v. Wheeling Pittsburgh Steel Corp., supra,* 521 F.2d at 42. Section 905(b), upon which plaintiff so heavily relies, speaks only of bringing negligence actions against *third-party* vessels; *i. e.,* vessels which do not directly employ the longshoremen. Moreover, the Congressional Committee Reports repeatedly characterize the new negligence action as "third party liability." *See* S.Rep.No.1125, *supra,* at 10–11; H.R. Rep.No.1441 at 4703–04. A literal reading does not yield any hint of an authorization for direct employee-employer lawsuits. The most logical construction of the statute, then, is that (1) third-party actions against vessels are permitted if sounding in negligence, *see* § 905(b), and (2) the longshoreman's employer can be liable only for statutory compensation, *see* § 905(a).

■ A final argument for not recognizing plaintiff's proposed cause of action is that a contrary result would violate the principles underlying the Act. The LHWCA was designed as a typical workers' compensation system, *see Northeast Marine Terminal Co., supra,* 97 S.Ct. at 2354, and consequently reflects the classic trade off between the certainty of benefits for the injured employee, and the limitation of the employer's liability. *See Murphy v. Woods Hole, Martha's Vineyard & Nantucket Steamship Authority, supra,* 545 F.2d at 238. Under workers' compensation statutes, the exclusive liability protection afforded to the employer cannot be pierced if the employee's injury is caused by the employer's negligence, or any other misconduct[16] short of genuine intentional injury.[17] *See* 2A A. Larson, The Law of Workmen's Compensation § 68.13 at 13–5 (1952). Since negligence actions against employers are not permitted under state compensation statutes, and since Congress' intent has always been to guarantee injured longshoremen treatment similar to that received by land-based workers covered by workers' compensation, *see Northeast Marine Terminal Co. v. Caputo, supra,* 97 S.Ct. at 2354;

---

**14.** *See* text accompanying note 12, *supra.*

**15.** Section 905(b) speaks only of actions against third-party *vessels.*

**16.** A covered employer can also be sued for failure to provide safety devices, employment of minors, and injuries falling outside the boundaries of the compensation act. 2A A. Larson, The Law of Workmen's Compensation § 67.21 at 12–39 (1952).

**17.** For example, in *Duncan v. Perry Packing Co.,* 162 Kan. 79, 174 P.2d 78 (1946), plaintiff employee, in seeking to avoid the exclusive coverage aspect of the state compensation act, alleged that the employer had negligently employed plaintiff's wife near a machine which the employer knew was improperly grounded and gave off electric shocks, and which subsequently electrocuted the wife. The court, assuming that gross negligence had been established, nevertheless held that the statutory compensation was the exclusive remedy. *See also Finch v. Swingly,* 42 A.D.2d 1035, 348 N.Y.S.2d 266 (1973) (notwithstanding employer's wanton negligence in directing the plaintiff to use defective equipment, employee could not escape the exclusivity provision of the workers' compensation law); *Southern Wire & Iron Inc. v. Fowler,* 217 Ga. 727, 124 S.E.2d 738 (1962) (workers' compensation held to be employee's exclusive remedy, since no actual assault occurred).

118 Cong.Rec., *supra,* at 36273 [18] and 36381, it should follow that LHWCA employers are also immune from negligence suits.[19]

For all the above reasons the Court opts to follow logic and common sense, admittedly the path less trodden. Plaintiff's motion for leave to file an amended complaint is denied and defendant's motion to enter judgment is granted. Defendant will prepare, serve, and lodge a judgment in form approved by plaintiff on or before April 19, 1978.

**18.** "*The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in nonmaritime employment ashore,* insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as unseaworthiness, nondelegable duty, or the like." 118 Cong.Rec. 36273 (remarks of Sen. Williams) (emphasis added).

**19.** Recall the pregnant words of the Third Circuit:

"There is no argument in logic and reason why an employer who owns barges should be treated less favorably than an employer who owns trucks." *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31, 42 (3d Cir. 1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).